IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF
WEST VIRGINIA, MARTINSBURG DIVISION

**HOMELAND TRAINING CENTER, LLC,**

                     *Plaintiff,*                 Civil Action No. 3:07-cv-160

v.                                          Judge Bailey

**SUMMIT POINT AUTOMOTIVE
RESEARCH CENTER, LLC,**

                     *Defendant,*

**HOMELAND SECURITY COMPANY,**

                     *Third-Party Defendant.*

## MOTION TO EXCLUDE TESTIMONY OF ANNA KOVALKOVA

Defendant/Third-Party Plaintiff Summit Point Automotive Research Center, LLC and the

William Scott Inter Vivos Trust ("SPARC"), pursuant to Daubert v. Merrell Dow Pharmaceuticals,

Inc., 509 U.S. 579 (1993), its progeny and the applicable Federal Rules of Evidence, hereby moves

to exclude testimony of Anna Kovalkova ("Kovalkova"), designated as an expert witnesses by

Plaintiff Homeland Training Center, LLC ("HTC"), from the upcoming trial of this matter.

A purported damages expert, Kovalkova admittedly performed no relevant analysis, due

diligence or other investigative work of her own. All of the assumptions underlying her purported

valuations of HTC (two unsigned, unexplained spreadsheets) were given to her by HTC's majority

owner, Mr. Doctor Crants, who told her what numbers to use and told her how to manipulate those

numbers to obtain larger damages estimate. Therefore, and for the reasons stated below, Kovalkova

is not qualified to give expert testimony, her proposed testimony is neither reliable or relevant under

Daubert and SPARC asks this Honorable Court to exclude her testimony.

1

## I.    Factual Background

### A.    Pre-remand history

On July 25, 2006, SPARC agreed to lease property in Summit Point, West Virginia to Third-Party Defendant Homeland Security Corporation ("HSC") on which HSC (and then HTC, after receiving an assignment from HSC) was to construct dormitory and other facilities for government contractors anticipated to use the SPARC facilities. Some government contractors used the SPARC facility for multiple training days, and it was HTC's hope that it could convince those government contractors (who normally stayed overnight at hotels in the area) to stay instead in HTC's to be constructed dormitory and to utilize other anticipated HTC services.

SPARC believed that HSC/HTC had taken too long to move forward with the lease, and, by letter dated October 17, 2007, declared its belief that the lease was terminated by HSC/HTC's inaction. HTC filed suit in this Court and, after representing that it had a financing commitment in place, obtained an injunction continuing the lease. In fact, HTC had no firm or complete commitment in place, and thereafter claimed it could not find financing at all. HTC then elected to pursue a suit for damages based on the October 17 letter, but this Court found the damages suit to be precluded by HTC's previous election of the injunction. [Docket no. 101]. However, on February 3, 2010, a panel of the United States Court of Appeals for the Fourth Circuit, by a vote of 2 to 1, reversed this Court's decision and remanded the case for a determination of HTC's damages.

### B.    HTC's claimed damages categories

HTC initially stated that it sought three categories of damages:

Category 1: Actual out-of-pocket expenses to develop the project. These include travel expenses, document preparation expenses, engineering consulting expenses and legal fees. (an itemized list is attached)

2

Category 2: Lost Profits for the [HTC] portion of the project (the HTC portion included the training center operations and 24% of the hotel and food service operation. Note that the remaining 76% of the hotel and food service operation was owned by Homeland Security Facilities LLC). The value of the lost profits of [HTC] were calculated by Anna Kovalkova at Pharos Capital Partners LLC at my request.

Ms. Kovalkova undertook the valuation of HTC's lost profits twice: once at September 18, 2007 (analysis included herein but also was provided with the first Request for Production of Documents). Using a 30% discount rate, the September 18, 2007 analysis produced a range of values: $8,665,235 on the low side and $12,755,941 on the high side with an average value of $10,710,588, Ms. Kovalkova revised and updated her valuation analysis on June 9, 2008. Attached to this answer are the emails, attachments and valuation analysis produced on June 9, 2008. As you can see from the valuation model marked "6/9/08 as of 6/9/08" the range of values was slightly lower; $8,057,070 on the low side and $12,187,286 on the high side with an average of $10,122,178.

Category 3: HTC also asked Anna Kovalkova to set a value for the leasehold. That analysis is provided in response to Question 1 of the Second Request for Production of Documents. The range of values for the leasehold is $6,522,474 and $7,095,420.

**Exhibit A**, Plaintiff's Answers to Defendants' Interrogatories (August 7, 2008). Kovalkova has

since admitted that the Category 3 figures actually represent possible *costs* to HTC – not losses or

damages. **Exhibit B**, Kovalkova Deposition, pp. 184-187. Accordingly, HTC, by counsel, has now

withdrawn this category of damages. **Exhibit C**, Crants Deposition, pp. 235-36. Although the

parties disagree concerning the amount of Category 1 damages, this Motion is directed to testimony

concerning Category 2 – HTC's alleged "lost profits."[1]

## C. Kovalkova's disclosures and deposition

Ms. Kovalkova is the only purported expert witness offered by HTC in support of its

---

[1] HTC has repeatedly confused its damages claim. While it mentions lost profits in some places, Kovalkova's testimony concerned "the value of the lost profits or really the lost valuation of the venture that Mr. Crants was going to launch." Exhibit B, p. 13; *but see* Exhibit A describing damages as "lost profits." Without a Rule 26(a)(2)(B) report or other explanation, it is difficult to understand if HTC seeks lost profits or lost business value. However, in light of the approach she used, it seems that Kovalkova – HTC's alleged damages expert – attempted to perform a business valuation.

3

damages claim.  Exhibit A; **Exhibit D**, HTC's Supplemental Rule 26(a)(2) Expert Disclosures; **Exhibit E**, HTC's Second Supplemental Rule 26(a)(2) Expert Disclosures.  Along with a statement that Kovalkova would testify to a valuation of HTC and possibly to HTC's lost financing opportunities, HTC produced two unsigned spreadsheets prepared by Ms. Kovalkova. *Id.* Neither HTC nor Kovalkova provided a written statement of or basis for the numbers appearing on the spreadsheet, nor did they disclose the data or information considered in formulating the spreadsheets. *Id.* Although it is not clear, the spreadsheets seem to imply that HTC seeks between $13.83 million and $25.70 million in Category 2 damages. These figures are well in excess of the figures quoted above as part of HTC's earlier damages estimates. Exhibit A.

Kovalkova previously prepared other valuations, none of which were explained in any other meaningful manner. **Exhibit F**, spreadsheets. Although the termination occurred October 17, 2007, HTC's value somehow has continued to grow with each new spreadsheet Kovalkova produced. Kovalkova admittedly did not base her increase on any underlying business or factual changes in HTC's situation. Exhibit B, p. 94, 98. HTC – a start up company with no income or contracts – did not increase in value. Instead, the increases were based on suggestions from Crants and HTC's attorneys. *Id.* at 106-107.   For example, SPARC learned through discovery that, in order to construct the anticipated projects at Summit Point, HTC was going to grant perpetual use of the Summit Point leasehold to a wholly separate company named Homeland Security Facilities, LLC ("HSF"). Exhibit C, pp. 133-34, 145.  HSF, not HTC, was the company that sought to obtain financing for the SPARC/HTC lease projects, *id.* at 133-34; HSF, not HTC, actually was going to run the dormitory anticipated in the lease, *id.* at 135, 141; and, HSF, not HTC, was anticipated to have cash flow from the projects at the SPARC site. *Id.* at pp. 258-59.

4

### 1.   Income/discounted cash flow methodology – government contracts

Although she provided no written explanation of her valuations, Kovalkova seems to use three approaches to value HTC. In the exhibits accompanying her expert disclosures, Kovalkova uses the income approach and discounted cash flow methodology to value HTC. The cash flow projections used in Kovalkova's valuations are based on HTC's supposed percentage interest in HSF. *Id.* HTC owned only 12% of HSF, and Crants owned another 12% of HSF. *Id.* at 182-83. In some of Kovalkova's cash flow estimates, however, she assumed that HTC's percentage interest in HSF was 17%, Exhibit F (see top left hand side immediately under "Homeland Training Center DCF Valuation"), in others, she assumed it was 24%, *id.*; and, in her official disclosures, she assumed it was either 24% or 100%, Exhibit E. When asked why she increased HTC's percentage of ownership in and cash flow from HSF (and thus HTC's Category II claim), Kovalkova responded that she was told to do so by Crants. She was not given any explanation and she was unaware of any change in HSF's ownership which might merit the increase. Exhibit B, 93-94, 98.

Indeed, Crants provided almost all of the numbers Kovalkova used. *Id.* at 64. Crants asked her to add an extra $900,000 into her analysis. *Id.* at 37. Crants supplied her with and asked her to change projected cash flows, and she did so without documentation and without understanding why. *Id.* at 64-65, 195. Crants asked her to change the discounts applied to such cash flows because he wanted to see what it looked like, *id.* at 99-100, although she admits that the discount rate for start up companies like HTC is "subjective." *Id.* at 134-35. Crants provided her with future revenue estimates, *id.* at 135-36, 140-41, and hypothetical growth rates. *Id.* at 144. Ms. Kovalkova performed no due diligence or independent evaluation of the numbers on her spreadsheet or the damages they purportedly represent, even though she acknowledged that such due diligence would

5

be important, *id.*, pp. 38, 145, 150, 192-93, 199, 201-02, 223, and even though she would have performed such due diligence had this been her own work. *Id.* at 206-09. She does not know how HTC's debt service numbers were calculated, *id.* at 195, or whether HTC's proposed operating expenses are accurate. *Id.* at 200. Critically, she does not remember reviewing any market surveys concerning future customers for HTC's business. *Id.* at 144. In short, Kovalkova admits that her valuations – the only documents provided with her expert disclosure – are not her work at all:

A:  And if you were to go back and look at Exhibit-9, and if you were to compare the real estate – hundred percent real estate cash flows shown on that exhibit, they're different.
Q.  Why?
A.  I don't know why. They were revised by Doc Crants.
Q.  All right. So this wasn't your work; it was his work?
A.  That's correct.
Q.  He provided you the figures; you put them into your spreadsheet?
A.  That's correct.
Q.  And then you hit whatever button does this computation, and the computation came out. Is that the way it works?
A.  That's correct. Since the template was already set up for the valuation. Once you update the numbers, it automatically ripples through.

*Id.* at 66-67. She also testified that HTC's attorneys changed various portions of HTC's damages calculation, stating that:

Q.  Who made the changes to those cash flows?
A.  Doc Crants did.
Q.  Why were they made?
A.  I believe it is in one of the e-mail trails. And I believe that this was actually driven by Dr. Crants' legal team, that they wanted for him to revise the assumptions that he used in his real estate company and how would that change cash flows, and then how would that ripple through the valuation ...
Q.  What explanation did Mr. Crants provide to you for this change?
A.  I believe just what I've told you, that this was driven by the – his legal team's request to revise the cash flows with updated assumptions.

Exhibit B, pp. 106-107; **Exhibit G**, June 29, 2010 e-mail. As Kovalkova noted, Crants's instructions concerning changing HTC's ownership percentage of HSF, "had a meaningful positive

impact to [sic] the calculated values." **Exhibit G,** February 19, 2010 e-mail.

Kovalkova also testified that she could not remember any sources of cash flow other than

those provided by Crants which she assumed reflected lost government contract revenues:

> Q.    I'll try again.  This whole cash flow analysis begins with the existence of
>        government contracts, does it not, and the presence of employees who are
>        there pursuant to government contracts?
> A.    To have projected cash flows, you don't have to have signed contracts.
> Q.    But you have to expect signed contracts?
> A.    Yes, have to expect.
> Q.    And you have to predict the existence of those contracts somehow?
> A.    Yes. There is an expectation and prediction that these contracts would be
>        signed once the training center is up and running.
> Q.    And in the absence of government contracts, this whole projection falls apart,
>        doesn't it? . . .
>
> [counsel for HTC]:   Objection. Calls for speculation.
> A.    The business can seek commercial customers.
> Q.    From what resources?
> A.    Again, commercial customers who, let's say, provide, you know, guards or
>        other services to the government agencies, and they need to have their
>        employees trained first.  So these – the training center could pursue
>        commercial customers as well.
> Q.    Do you know of any commercial customers that the training center was
>        targeting?
> A.    I cannot remember. My understanding was that they were going to target
>        predominantly government customers.

Exhibit B, pp. 53-55. However, Kovalkova was unaware of any existing contracts and did not know

of any contracts on which HTC intended to bid.  *Id.,* pp. 31-32, 54-56.  She did not discuss

government contracts with any relevant organization, nor was she aware of the number of contract

employees trained at Summit Point.  *Id.* at 148-49.   She knew of no formal analysis used to

determine SPARC's (and therefore HTC's) potential government contractor customer base.  *Id.* at

151.  Kovalkova knew of no facts to support HTC's claim that it would have obtained specific

"peacekeeper" contracts.  *Id.,* p. 59.  Nevertheless, Kovalkova assumed that the cash flow estimates

provided to her by Crants depended on the existence of government contracts.  *Id.* at 138.

7

## 2.    Market Approach/Guideline Public Company Methodology and Transaction Methodology

Although Kovalkova again offers no written explanation, her bottom-line damages/valuation

figures depend, not only on HTC's alleged future cash flow, but also on the market approach in

valuing HTC. One alternative method, the "Guideline Public Company" method, "uses the market

price of common stock of publicly traded companies that have similar characteristics to the subject

company. A trading multiple is then developed and applied to an earnings stream of the subject

company to provide an indication of value of the subject company." In re Global Technovations,

Inc., 431 B.R. 739, 767 (Bkrtcy.E.D.Mich. 2010). This approach critically depends upon the proper

choice of comparable publicly traded companies, as Ms. Kovalkova admits. Exhibit B, p. 76,

It is unclear, however, why Kovalkova selected as alleged comparables the particular

companies listed in her spreadsheet: DynCorp, Armor Group, Securitas and GS4. She authored no

Rule 26 report, and her two spreadsheets contain no explanation as to why she believed those

companies were comparable. Forced to depose her to try to understand, SPARC learned that

Kovalkova does not remember who made the decision to use those companies or how those

decisions were made. _Id._, pp. 77-78. She does not remember which companies might have

competed with HTC for government contracts – the source of HTC/HSF's projected revenue – and

did not determine if any competitors even exist. _Id._ at 56, 88. When asked why DynCorp, a 60 year

old company with thousands of employees and over $900 million in revenues,[2] was comparable to

HTC, a start up company with no employees or revenue, she suggested that they both provide

"services to government agencies," _id._ at 81, although she did not remember what business DynCorp

---

[2] Information about DynCorp is publicly available at http://ir.dyn-intl.com/financials.cfm.

8

was in. *Id.* at 28. She concluded that the size of a company is irrelevant for comparison purposes. *Id.* at 28-29. Without explanation, Kovalkova assumed that HTC's "pre-tax income" would be between 44% and 55% of its revenue. Exhibit E. However, the comparable companies she chose had "pre-tax income" of between only 3% and 6%. Essentially, Kovalkova assumed that HTC would be far far more profitable than her choice of "comparable" companies.[3]

Kovalkova's report also suggests that she attempted to employ a "Guideline Transaction" method, which relies on the aggregate stock value of similar companies involved in contemporaneous mergers or acquisitions, the application of a valuation multiple to the subject company's earning stream and the subtraction of the company's interest bearing debt. In re Global Technovations, Inc., 431 B.R. at 768. This approach also depends on the proper choice of comparable transactions. Exhibit B, p. 76. As with her other approaches, Ms. Kovalkova offered no explanation of how or why she relied on the transactions listed on her spreadsheets, transactions involving companies many factors larger and more valuable than HTC. Exhibit E; Exhibit K, p. 25. Kovalkova has provided no written explanation of these approaches. SPARC was forced, at considerable cost, to retain multiple experts to analyze Kovalkova's unexplained spreadsheets.

## D.    Anna Kovalkova's background

Although she has taken some accounting courses, Ms. Kovalkova is not an accountant and

---

[3] *See* Exhibit E, first spreadsheet. Looking at the box in the lower right entitled "Homeland Training Center's Implied Valuation," the 44%-55% figures are derived by dividing the "pre-tax income" numbers in the middle of the first column into the corresponding yearly revenue figures in the top half of the same column (note: Kovalkova erroneously omitted the revenue for the real estate company in her first alternative calculation of value. The percentages cited here were corrected for her error. *See* Exhibit K, Martin report, ¶¶72, 79). The 3%-6% "pre-tax cash income" for the comparable companies are derived by performing the same division of the "pre-tax income" numbers in the upper right section of the box entitled "Homeland Training Center Comparable Company Analysis" into the corresponding yearly revenue figures in the section immediately to the left in the same box.

has no postgraduate degree. Exhibit B, pp. 158, 244. She is not a business valuation expert, she does not know what the business valuation standards are, and she does not know if her valuation of HTC complies with such standards. *Id.* at 158-61. She has never offered expert testimony prior to this case, *id.* at171, and has never published any books or papers in the area of business valuation. *Id.* Kovalkova was not paid for her work in this case. She works for an investment company partly owned by Crants's son and which lists HSC – HTC's assignor and third-party defendant in this case – as part of its portfolio. *Id.* at16-17, 247; http://www.pharosfunds.com/ portfolio.php.

## II. Discussion of Law

### A. Standard for expert testimony

Rule 702 of the Federal Rules of Evidence states that:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) and Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999), the United States Supreme Court explained a court's "gatekeeping role" stating that "under the Rules the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Daubert at 589. "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." *Id.* at 591-592. A purported expert's knowledge must be "more than subjective belief or unsupported speculation." *Id.* at 590. It must be "be the reliable product of reliable principles and methods that are reliably applied to the facts of the case" U.S. v. Johnson, — F.3d —, 2010 WL 3307360, *6 (4th Cir. 2010) (citations omitted); Tyger Const. Co. Inc. v.

Pensacola Const. Co., 29 F.3d 137, 142 (4th Cir.1994) *cert. denied* 513 U.S. 1080 (1995) ("expert's opinion should be excluded when it is based on assumptions which are speculative and are not supported by the record") (citations omitted).

Although some specific reliability tests should be applied where applicable (whether the testimony is capable of being tested, peer review and publication, error rates, controlling standards and widespread acceptance within a relevant scientific community), the ultimate test for reliability is flexible and a trial court is given "broad latitude" to determine the reliability of an expert's testimony. Kumho at 141-42, 152. With respect to a damages expert, a court "can only admit an expert's opinion when competent evidence proves to a degree of reasonable certainty that Plaintiff will suffer the claimed damages." Water Engineering Consultants, Inc. v. Allied Corp., 674 F.Supp. 1221, 1224 (S.D.W.Va.1987) (citing Baker v. Kroger, 784 F.2d 1172 (4th Cir.1986)).

The proponent of expert testimony has the burden to establish its admissibility by a preponderance of the evidence. Cooper v. Smith & Nephew, Inc., 259 F.3d 194, 199 (4th Cir.2001). Given the technical nature of the subject, a witness testifying to business valuation must qualify under Rule 702 and Daubert. Frymire-Brinati v. KPMG Peat Marwick, 2 F.3d 183, 186-87 (7th Cir. 1993); Ullman-Briggs, Inc. v. Salton/Maxim Housewares, Inc., 1996 WL 535083, *3 (N.D.Ill.1996) ("[w]hile business evaluation may not be one of the traditional 'sciences,' it is nevertheless a subject area that employs specific methodologies and publishes peer-reviewed journals.") (citation omitted); Team Gordon, Inc. v. Fruit of the Loom, Inc., 2010 WL 419952, *2 -3 (W.D.N.C.,2010); Robert L. Dunn, RECOVERY OF DAMAGES FOR LOST PROFITS, Vol. II, p. 581 (6th ed. 2005) ("A projection of lost profit damages will almost always require some form of expert testimony") (**Exhibit I**).

"[G]iven the potential persuasiveness of expert testimony, proffered evidence that has a

11

greater potential to mislead than to enlighten should be excluded." Westberry v. Gislaved Gummi AB, 178 F.3d 257, 261 (4th Cir. 1999) (citation omitted); Mitchell v. Gencorp Inc., 165 F.3d 778, 782 (10th Cir. 1999) ("Under Daubert, any step that renders the analysis unreliable renders the expert's testimony inadmissible") (citation and internal punctuation omitted).

**B.   HTC's proffered expert and opinion testimony is inadmissible.**

### 1.   The testimony of Anna Kovalkova, HTC's only purported expert, is not reliable

Ms. Kovalkova's testimony is not reliable because, in a very real sense, it is not her testimony. She testified that she changed critical figures, adding millions of dollars more to HTC's damages claims, based solely on orders by Mr. Crants or his legal team. *See* Exhibit B, pp. 93-94, 98-99 (Crants told her to change his and HTC's percentage ownership in HSF); p. 37-39 (Crants told her to include $900,000 future cash payment to HTC/HSF); pp. 64-65 (Crants told her to change projected cash flows); p. 64 (Crants gave her almost all the relevant numbers); pp. 99-100 (Crants told her to change the discounts to the cash flows); p. 144 (Crants supplied growth rates); pp. 106-107 (legal team wanted changes to cash flow from HSF); Exhibit C, Crant's Deposition, p. 271 ("I ordered her to [change the discount rates]. So, she did. Ordered is not the right word. I requested that she do it my way"). She admits that, contrary to her usual work practice, she performed no due diligence. Exhibit B, pp. 38, 145, 150, 192-93, 199, 201-202, 206-09 and 223. That admission alone disqualifies her *See e.g.* Sheehan v. Daily Racing Form, Inc., 104 F.3d 940, 942 (7th Cir.1997) ("Daubert . . . requires the district judge to satisfy himself that the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting").

For other key aspects of her report, Ms. Kovalkova doesn't remember what data she relied on or why she chose the data. *Id.* at 195 (no knowledge of debt service numbers); p. 200 (no

knowledge if operating expenses are accurate); p. 144 (no memory of market surveys); pp. 31-32
(never reviewed any contracts necessary to cash flow); pp. 148-49, 151, 158 (did not discuss future
government contracts or studies concerning potential contracts); pp. 77-78 (does not remember who
made the decision to use the supposedly comparable or how those decisions were made); pp. 56, 88
(did not know about possible competitors).

Such complete dependence on the unverified estimates of others makes Ms. Kovalkova's
testimony unreliable. In Lyman v. St. Jude Medical S.C., Inc., 580 F.Supp.2d 719 (E.D.Wis. 2008)
the Court excluded damages projections based on lost sales offered by an expert who did not
independently verify the data given to him by his client's attorney. Finding that the witness "did not
independently verify the source and accuracy of the data," the Court concluded:

> "The data which forms the basis for [the expert's] projections are not reliable. [He]
> should have independently verified the reliability of the data before opining on
> plaintiffs' future sales, as opposed to accepting it at the word of . . . counsel.
> Therefore, the Court must exclude . . . testimony with regard to his projections."

*Id.* at 726-27 (citing In re TMI Litig., 193 F.3d 613, 697-98 (3rd Cir.1999) (upholding exclusion of
expert testimony where sole basis for the testimony was summaries prepared by party's attorney);
Montgomery County v. Microvote Corp., 320 F.3d 440, 448-49 (3rd Cir.2003) (underlying data was
unreliable where expert did not base his opinion on primary data, did not know what the document
was, who created it, or how it was created); Crowley v. Chait, 322 F.Supp.2d 530, 546-47
(D.N.J.2004) (where expert relied on summaries prepared by counsel and conducted little
independent investigation, "to allow him to offer testimony to a jury as to conclusions he has reached
on the basis of this highly filtered version of events, is unacceptable")); *see also* Meterlogic, Inc. v.
KLT, Inc., 368 F.3d 1017, 1019 (8th Cir. 2004) (affirming exclusion of expert where expert did not
review market data, did not review data underlying business growth rate, did not have data

concerning future sales and where expert based analysis on an "investment-planning tool"). The
Supreme Court has held that "nothing in either Daubert or the Federal Rules of Evidence requires
a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of
the expert." Kumho, 526 U.S. at 157 (citation omitted).[4] Ms. Kovalkova's report is not even her
own *ipse dixit*: HTC is asking the Court to accept her damages conclusions not because she said it,
but because someone else (Crants) told her to say it.

Furthermore, there are significant problems with Ms. Kovalkova's qualifications. "[E]xperts'
respective qualifications are important indicators of the reliability of their opinions." Clark v. Eagle
Nest, Inc., 1998 WL 830658, *2 (4th Cir. 1998) (citations omitted). HTC must prove by the
preponderance of the evidence that Ms. Kovalkova's qualifications suffice. *See* Cooper v. Smith
& Nephew, Inc., 259 F.3d 194, 199 (4th Cir. 2001).

Because business valuation expertise is subject to Daubert-level expert gatekeeping (*see*
cases cited *supra* at 11), Ms. Kovalkova's testimony must meet the Daubert standards. Although
she has taken some accounting courses, Ms. Kovalkova is not a certified public accountant, nor is
she certified by any professional business valuation organization. She does not have an accounting
degree or any postgraduate degree. Exhibit B, pp. 158-59, 244. She is not a business valuation
expert, she does not know what the standards for business valuation, and she does not know if her
purported report (two unsigned, unexplained spreadsheets) complies with such standards. *Id.* at 158-
62. She has never offered purported expert testimony prior to this litigation. *Id.* at 171. She has
never published any books or papers in the area of business valuation or in any other area. *Id.*

---

[4] "Ipse dixit is Latin for 'he himself said it.' The term means '[s]omething asserted but not
proved.'" Banks v. U.S., 93 Fed.Cl. 41, 49 (Fed.Cl. 2010) (citing Black's Law Dictionary).

14

Kovalkova lacks sufficient qualifications to provide expert testimony concerning economic modeling, cash flows, revenue streams, merger possibilities or the other matters involved in valuing a start-up company like HTC.[5] *See also* C & O Motors, Inc. v. General Motors Corp., 2007 WL 2156587, *4-6 (S.D.W.Va.2007) (witness's failure to "rely on any treatises, expert reports, or books in formulating his lost profits analysis" relevant under Daubert).

In fairness to Ms. Kovalkova, she did not claim to do any specialized, technical work normally underlying business valuation testimony: she admitted that all the numbers came from Crants and she merely put them into a spreadsheet.[6] *Id.* at 67. Even her role as a spreadsheet compiler is suspect, however, because "the template was already set up for the valuation." *Id.* Merely inserting numbers into a previously prepared template is not an adequate basis for Rule 702 testimony. *See e.g.* U.S. v. Johnson, 54 F.3d 1150, 1162 (4th Cir. 1995) ("simple arithmetical calculations were not an appropriate subject for expert testimony under Rule 702") (citation omitted) *cert. denied* 516 U.S. 903.

Under the Rules of Evidence, an expert witness may not "under the guise of giving expert testimony become the mouthpiece of the witnesses on whose statements or opinions the expert purports to base his opinion." Loeffel Steel Prods., Inc. v. Delta Brands, Inc., 387 F.Supp.2d 794,

---

[5]  Had Ms. Kovalkova reviewed the professional standards applicable to her purported valuation, *see* Uniform Standards of Professional Appraisal Practice, authorized by Congress as the source of appraisal standards, available at http ://www.uspap.org /2010 USPAP/index.htm, she would have realized, among other things, that she needed to independently verify Mr. Crants's cash flow estimates through market evidence (Statement 2 at http ://www.uspap.org /2010USPAP /USPAP/stmnts/smt_ 02. htm). In addition to the legal deficiencies noted in this Motion, Kovalkova's valuation contains numerous technical deficiencies which are set forth in detail in the attached SPARC expert witness reports Exhibit J (Carr report) and Exhibit K (Martin report – including report appendices A-C). SPARC regrets the length of the attachments. However, unlike Kovalkova's "report," a proper expert report must consist of more than two unexplained spreadsheets.

808 (N.D.Ill.2005) (citations omitted). Ms. Kovalkova is not an expert on business valuations, lost profits, merger possibilities, or any other subject related to HTC's damages claims, and she should not be allowed testify as an expert.[7]  *See also* expert reports attached as Exhibits J and K.

## 2.    Any proffered damages testimony is unreliable because it is based on multiple layers of speculation and unreliable assumptions

Even if Ms. Kovalkova were a qualified, independent expert, her testimony is inadmissible because it is admittedly based on hypothetical, purely subjective estimates that Mr. Crants has repeatedly increased since the October 17, 2007 termination date.

### a.    HTC has not lost any identifiable contracts and it was not reasonably certain to obtain any contracts.

Under West Virginia law, the damages HTC claims "can not be based on estimates which amount to mere speculation and conjecture but must be proved with reasonable certainty. A new business may recover lost profits in a breach of contract action, but only if the plaintiff establishes the lost profits with reasonable certainty; lost profits may not be granted if they are too remote or speculative." Syl. pts. 1 & 2, Cell, Inc. v. Ranson Investors, 189 W.Va. 13, 427 S.E.2d 447 (1992). To the extent that HTC argues that Kovalkova's flawed and erroneous business valuation enumerates a lost profit claim (as HTC does in places allege), such a claim is subject to the Cell standard. Moreover, a claim based on diminution of business value logically should be subject to the same standards as a lost profit claim, especially where HTC, a start up company, had no previous

---

[7] Nor may Kovalkova testify to business value as a lay witness under Fed. R. Evid. 701. As she repeatedly admitted, she obtained all her information from Crants – she never personally investigated HTC's finances and therefore lacks the first-hand, personal knowledge required by the Rule. *See e.g.* JGR, Inc. v. Thomasville Furniture Indust., Inc., 370 F.3d 519, 524-26 (6th Cir. 2004); DIJO, Inc. v. Hilton Hotels Corp., 351 F.3d 679, 685-87 (5th Cir. 2003).

16

established income or value.[8]

Although her damages testimony crucially depends on lost revenue based on government contracts, Exhibit B, pp. 53-55, 138, Kovalkova was unaware if any contracts even existed or were to be bid on. *Id.*, pp. 31-32, 54-55. She did not know about government contracts at the SPARC site and did not talk to anyone to find out. *Id.* at 148-49. She was unaware of the potential government contractor customer base. *Id.* at 151, and knew of no facts to support HTC's claim that it would have obtained specific government contracts. *Id.*, p. 59.[9]

HTC's claim that it and HSF lost millions in business value as a result of lost future government contracts, therefore, is pure speculation. Indeed, in the material sent by HSF to its potential investors, HSF admitted that its undertaking was speculative. **Exhibit H**, Subscription Agreement, p. 2 ("The Purchaser recognizes the speculative nature and risks of loss associated with investments in start-up development stage companies and that the Purchaser may suffer a substantial loss of or all of the Purchaser's investments in [HSF]. . . . this is a speculative investment which involves a high degree of risk of loss . . ."). HTC is attempting to take a speculative investment hope (a "pitchbook" as Ms. Kovalkova calls it, Exhibit. B, pp. 206-07) and turn it into a multi-million dollar damages claim. This is not permissible under West Virginia law. Cell, syl. pts. 1 & 2; Addair v. Motors Ins. Corp., 207 S.E.2d 163, 168-69 (W. Va. 1974) ("Mere speculative and conjectural estimates of profits which might have been made, or of the loss of gains and profits which might

---

[8]On the other hand, "[t]he proper measure of damages for the destruction of an *established* business is the difference between the fair market value of the business before and after its destruction." Syl. pt. 3 Lively v. Rufus, 533 S.E.2d 662 (W.Va.2000) (emphasis added).

[9] Kovalkova's ultimate information source, Mr. Crants, admitted that he had no contracts in place, he did not even have any letters of intent for such contracts and he could not identify any contracts he might bid on or obtain. Exhibit C, pp. 196-97, 207-08 and 322.

have been made, are not a legitimate basis upon which to fix damages"); Bryte ex rel. Bryte v. American Household, Inc., 429 F.3d 469, 477 (4th Cir. 2005) *cert. denied* 547 U.S. 1129 (2006) ("Daubert aims to prevent expert speculation . . .").

In summary, no government contracts existed on which HTC could have lost any revenue – none existed, none were promised, none have even been identified as possible. Case law clearly holds that one may not base a lost profit claim on such future, hypothetical third-party contracts. *See e.g.* Mann v. U.S., 68 Fed.Cl. 666, 669 (Fed.Cl. 2005) ("fruits of the contract or the opportunities crowded out by the breach of the contract" too remote to be considered as damages); Rumsfeld v. Freedom NY, Inc., 329 F.3d 1320 (Fed. Cir. 2003) *cert denied* 541 U.S. 987 (2004) (rejecting claim for profits lost on future contracts); Wells Fargo Bank, N.A. v. U.S., 88 F.3d 1012 (Fed. Cir. 1996) *cert denied* 520 U.S. 1116 (1997); Olin Jones Sand Co. v. United States, 225 Ct.Cl. 741, 1980 WL 13211 (1980) ("Receipt or non-receipt of future contracts is both speculative in nature and dependent on many factors not related to [the injury to the plaintiff]"). Crants's speculation fatally infects Kovalkova's testimony. C & O Motors, Inc. v. General Motors Corp., 2007 WL 2156587, *4-6 (S.D.W.Va.2007) (excluding purported lost profits expert where unreliable portion of sales projections formed the basis of other portions of the testimony).

### b. Kovalkova's Public Company and Transaction analysis is unreliable, irrelevant and riddled with technical errors.

As discussed above, Kovalkova attempted to value HTC based on comparisons with certain public companies and transactions involving those companies. Exhibit E. These analyses, as Kovalkova admits, depend on the existence and proper use of comparable companies. Exhibit K, pp. 21, 24-25; Exhibit B, p. 76. However, Kovalkova provided no explanation of her choice of the comparable companies on her spreadsheets – she doesn't know why those companies were chosen,

18

who chose them or what business they were in. *Id.* at 28, 77-78. Kovalkova's lack of explanation prevents the Court from assessing the reliability of her analysis and suffices to exclude her testimony. *See e.g.* Lippe v. Bairnco Corp., 288 B.R. 678, 697-98 (S.D.N.Y.2003)(rejecting testimony of expert who chose comparable companies "without explaining why and without any independent analysis of whether the supposed comparables actually were comparable") affirmed 99 Fed.Appx. 274 (2nd Cir. 2004) (expert's "indicia of unreliability" included "inability to explain a number of variables and assumptions used . . . and which companies were comparable to those being valued").

Moreover, Kovalkova's disclosure provided no analysis of the required similarities between the companies she chose and HTC. Exhibit E. Incredibly, Kovalkova seems to believe that potentially massive differences in size do not matter for comparison purposes. *Id.* at 28-29. This is simply wrong. Courts hold that "[a] 'comparable' must be substantially similar to the entity or asset that is at issue." Caracci v. C.I.R., 456 F.3d 444, 459 (5th Cir. 2006) (citations omitted); Celebrity Cruises Inc. v. Essef Corp., 434 F.Supp.2d 169, 179 (S.D.N.Y.,2006) ("the comparable companies method is reliable only to the extent that the companies chosen are truly comparable"). West Virginia specifically requires a close size comparison for damage estimate purposes. Cell, Inc. v. Ranson Investors, 427 S.E.2d 447, 450 (W.Va.1992) (rejecting as speculative comparison of alleged profitability of 9200 sq. ft. store with 17200 sq. ft. store).

Kovalkova is attempting to compare HTC – a start-up, private company with no history of income or profit – to vastly larger, highly profitable, established public companies without any plausible basis for doing so other than that they "provide services to government agencies." Exhibit B, p. 81. Her selection of companies which are not remotely comparable to HTC shows that Kovalkova's testimony is simply unreliable and irrelevant to the valuation of HTC, and therefore

19

inadmissible under Daubert. Lippe, 288 B.R. 678; In re Med Diversified, Inc., 346 B.R. 621, 642 (Bkrtcy.E.D.N.Y.2006) (precluding testimony of valuation expert who attempted to place transaction value on $234 million company based by comparing transactions involving companies ranging from $700,000 to $87 million).

Additional technical errors plague Kovalkova's guideline public company and transaction valuation methodologies: she did not purport to justify the respective weights she attached to her comparables, Exhibit B, p. 26, she did not explain the discounts she applied, *id.* at 130, she did not subtract the amount of long term, interest bearing debt as of the valuation date from the enterprise value, Exhibit K, p. 24 and she fails properly to match numerators to denominators in her transaction multiple calculations. *Id.* at 26. *See* Exhibit K, Martin report, pp. 21-26.

### c.   Kovalkova attributes to HTC damages to which it admits it is not entitled.

Kovalkova's testimony additionally is suspect because it fundamentally confuses the identity of the supposedly damaged party. HTC's lost business valuation in this case is based on the alleged damages to HSF – the company that was to construct and operate the lease projects. Exhibit C, p. 133-35, 141 258-59. HTC owns 12% of HSF, and supposedly owns an additional 12% based on a gift from Crants of his 12% interest, an undocumented, implausible gift he claimed existed for the first time at his August 20, 2010 deposition. *Id.* at 182-84. Although, if Kovalkova and Crants are to be believed, 12% of HSF is worth millions, no consideration was paid for this gift to HTC and the transaction was apparently never memorialized. *Id.* Nevertheless, Kovalkova assumed that HTC was entitled to 24% of HSF's alleged damages based on Crant's orders. Exhibit B, p. 46. Without verifying HTC's interest, Kovalkova's assumption simply cannot meet the Daubert requirements. *See ipse dixit* cases cited *supra* at pp. 14-15.

Even more troubling, Kovalkova has submitted a business valuation based on HTC's 100%

ownership of HSF – again on Crants' orders. Exhibit B, 93-94, 98. But Crants himself admitted that

he had no legitimate reason for asking for 100% of HSF's alleged damages:

> Q.    What was the reason for the change to 100 percent as opposed to 24 percent?
> A.    It occurred to me that the termination letter for October 17 screwed the
>       project up for everybody. I had only been measuring the damages done to
>       me. I had not paid any attention to what the damages might have been to
>       Homeland Security Facilities, LLC. So, I thought it useful to try to get a
>       handle on how much damage was done to all the parties involved in the
>       project, instead of a very narrow focus on what was done to me.
>            And it was mostly to get a clearer picture about how far flung was the
>       impact of the October 17 letter. The only way to get a grander picture of it
>       was to take into account all the revenue. And so, it's not -- it was not done to
>       get a feel for what my damages are, because we only owned 24 percent, but
>       to get a feel for -- for the sum of all the damages that had been done.
> Q.    Homeland Security Facilities isn't a party to this litigation, is it?
> A.    No.
> Q.    And neither is Doctor Robert Crants?
> A.    Correct.

Exhibit C, pp. 269-70 (Crants had no legal interest in HSF at the time of SPARC's breach. Id. at

213-14). Apparently, in order "to get a handle on" or "get a feel for" alleged losses to non-parties

who have never contracted with or sued SPARC, Crants feels the need to sue SPARC for an extra

approximately $12 million dollars, and Kovalkva did what Crants told her to do in order to put those

"damages" on paper. Exhibit E ($25.7 million estimated damages based on 100% of HSF, $13.83

million based on 24% of HSF).

Crants's euphemisms poorly hide his attempt to claim millions of dollars in damages to

which he has no entitlement. The fact that Kovalkova lent her name to such a shamelessly inflated

and flawed business valuation destroys her credibility as an expert and mandates the exclusion of

her testimony. She has presented a damages claim which she knows is without merit because Mr.

Crants wanted to increase his damages claim. Exhibit B, pp. 93-94. Her purported testimony

therefore should be excluded. Guillory v. Domtar Indus., Inc., 95 F.3d 1320, 1331 (5th Cir.1996) (expert testimony properly excluded where it is not based upon facts in the record but on altered facts and speculation designed to bolster party's position)

### 3. Kovalkova's report is insufficient under Rule 26(a)(2)(B) and fails to consider the issue of causation.

HTC's disclosure of Kovalkova's purported expert testimony consists of a brief statement that she will testify to HTC's value and possibly to the impact of SPARC's actions on HTC's ability to obtain financing and two unexplained spreadsheets filled with various numbers and abbreviation. Exhibit E. Nowhere in her spreadsheets does Ms. Kovalkova explain her numbers, the reasons or basis for her numbers, or the data she relied on. *Id.* She has not even signed her "report" such as it is. Kovalkova's spreadsheets are clearly insufficient under Fed. R. Civ. P. 26(a)(2)(B)(I)-(iii).

In a detailed analysis of expert report requirements, the Seventh Circuit stated that:

"Rule 26(a) expert reports must be detailed and complete. A complete report must include the substance of the testimony which an expert is expected to give on direct examination together with the reasons therefor. . . . The report must be complete such that opposing counsel is not forced to depose an expert in order to avoid ambush at trial . . . . Expert reports must not be sketchy, vague or preliminary in nature. . . . Expert reports must include 'how' and 'why' the expert reached a particular result, not merely the expert's conclusory opinions. . . . [and] must be signed by the expert."

Salgado by Salgado v. General Motors Corp., 150 F.3d 735, 742 n. 6 (7th Cir. 1998) (citations omitted and internal punctuation altered and omitted). Kovalkova's "report" failed to meet any of the above-listed standards, and SPARC was forced to depose her to attempt to understand her spreadsheets. Her "report" is simply too inadequate to be admissible. *See also* Cambridge Capital Group v. Pill, 2001 WL 733202, \*2 (4th Cir. 2001) (affirming exclusion of expert report "so vague that they did not permit Appellees to prepare a proper defense"); Bennion v. U.S., 2006 WL 4524339, \*4 (D.Idaho 2006) *affirmed* 288 Fed.Appx. 443 (9th Cir. 2008) ("The opposing party

should not have to guess when information is omitted [from an expert's report]"); Sierra Club, Lone Star Chapter v. Cedar Point Oil Co. Inc., 73 F.3d 546, 571 (5th Cir. 1996) (one or two paragraph description of expert testimony insufficient) *cert denied* 519 U.S. 811 (1996).

Despite being listed as a possible expert on causation – (Exhibit E, "She may also testify as to the impact of the Defendants' actions on HTC's ability to obtain financing . . .") – Kovalkova's spreadsheets contain no discussion of causation whatsoever. At her deposition, she testified that she was not familiar with any financial commitments made by anybody to the project, and she has no knowledge of any written commitment for financing. *Id.* at 219-20. She simply never considered the cause of HTC's ability to obtain financing which is the alleged cause of HTC's damages. As Crants admitted at deposition, HTC's hoped for financing failed on multiple occasions for reasons unrelated to SPARC's actions. Exhibit C, pp. 91-94, 118-123.

Courts have found that a purported damages expert's failure to consider the cause of damages undermines the expert's testimony. *See e.g.* Children's Broadcasting Corp. v. Walt Disney Co., 245 F.3d 1008, 1018 (8th Cir. 2001) (cash flow expert testimony disallowed where "his theory of causation was questionable"); Tyger Const. Co. Inc., 29 F.3d at142 ("An expert's opinion as to damages must be causally related to the alleged harm") (citations omitted); Water Engineering Consultants, Inc. v. Allied Corp., 674 F.Supp. 1221, 1224 (S.D.W.Va.1987) (a court "can only admit an expert's opinion when competent evidence proves to a degree of reasonable certainty that Plaintiff will suffer the claimed damages") (citation omitted); Salazar v. U.S., 2003 WL 25695854, *3-4 (S.D.W.Va. 2003) (failure of expert to consider alternate explanations is a factor to consider under Daubert) (citations omitted); *Robert L. Dunn*, RECOVERY OF DAMAGES FOR LOST PROFITS, Vol. II, p. 685 (6th ed. 2005) (plaintiff must show "profitable opportunities that were lost"); Fashion

23

Boutique of Short Hills, Inc. v. Fendi USA, Inc., 75 F.Supp.2d 235, 238 (S.D.N.Y.1999) ("expertise is not helpful to the extent that it is based upon a causation assumption that plaintiff cannot prove").

Kovalkova has not made any attempt to relate her unsigned, unexplained and unsupported damages spreadsheets to SPARC's actions. She simply assumes that SPARC should pay HTC between $13.83 and $25.7 million dollars because Mr. Crants wanted her to say that. This is a wholesale abdication of her duty as a purported expert. *Dunn*, p. 646 ("More is required of a plaintiff than the assertion (either directly or through an expert witness) that plaintiff would have made a particular amount in profits").

## III. Conclusion

The end result of Ms. Kovalkova's work in this case is that SPARC apparently faces a ruinous $25.7 million dollar claim based on two, unexplained spreadsheets which incorporate Mr. Crants's assumptions without even the pretext of due diligence, expert review or justification. Therefore, and for the reasons stated above, Ms. Kovalkova's testimony is fundamentally unreliable and SPARC asks this honorable Court to exclude her testimony and her alleged business valuation spreadsheets from the trial of this matter.

**SPARC**, by counsel

**s/Wm. Richard McCune, Jr.**
Wm. Richard McCune, Jr. (WV Bar #2429)
Alex A. Tsiatsos (WV Bar #10543)
*Wm. Richard McCune, Jr. PLLC*
115 West King Street
Martinsburg, WV 25401
304-262-2500

Peter L. Chakmakian (WV Bar #687)
*Peter L. Chakmakian, L.C.*
108 North George Street
P.O. Box 547
Charles Town, WV 25414
304-725-9797

IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF WEST
VIRGINIA, MARTINSBURG DIVISION

HOMELAND TRAINING CENTER, LLC,

               *Plaintiff,*

v.                                        Civil Action No. 3:07-cv-160
                                        Judge Bailey

SUMMIT POINT AUTOMOTIVE RESEARCH
CENTER, LLC,
               *Defendants, et al.*

## CERTIFICATE OF SERVICE

       I, the undersigned attorney, counsel for Defendants Summit Point Automotive Research Center,

individually and in its capacity as trustee of the William Scot Inter Vivos Trust in the foregoing action,

hereby certify that on this 20th day of September 2010, I served a true and accurate copy of the foregoing

**Motion to Exclude Testimony of Anna Kovalkova** by filing the same with the Clerk using the CM/ECF

system which will send notice to:

J.H. Mahaney, Esq.
Huddleston Bolen, LLP
P.O. Box 2185
611 Third Ave.
Huntington, WV 25701


**s/ Wm. Richard McCune, Jr.**
Wm. Richard McCune, Jr. (WV Bar #2429)
Alex A. Tsiatsos (WV Bar #10543)
Peter L. Chakmakian (WV Bar #687)

## Exhibit List

Exhibit A:    Plaintiff's Answers to Defendants' Interrogatories (August 7, 2008)

Exhibit B:    July 8, 2010 Deposition of Anna Kovalkova (excerpts)

Exhibit C:    July 20-21, 2010 Deposition of Doctor Crants (excerpts)

Exhibit D:    HTC's Supplemental Rule 26(a)(2) Expert Disclosures (exhibit omitted)

Exhibit E:    HTC's Second Supplemental Rule 26(a)(2) Expert Disclosures

Exhibit F:    spreadsheets

Exhibit G:    e-mails (produced at Kovalkova deposition)

Exhibit H:    Subscription Agreement

Exhibit I:    Robert L. Dunn, Recovery of Damages for Lost Profits (6th ed. 2005) (excerpts)

Exhibit J:    Expert report of Scott Carr (portions)

Exhibit K:    Expert report of Harold Martin (including appendices A-C)