# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

## MARTINSBURG DIVISION

**HOMELAND TRAINING CENTER, LLC,**

        Plaintiff,

v.

**SUMMIT POINT AUTOMOTIVE RESEARCH CENTER, LLC** and the **WILLIAM SCOTT INTER VIVOS TRUST**

        Defendants/Third-Party Plaintiffs,

v.

**HOMELAND SECURITY CORPORATION,**

        Third-Party Defendant.

**Civil Action No. 3:07-cv-160**
**Judge Bailey**

## **DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION TO PERMIT IT TO DISCLOSE AND DESIGNATE REBUTTAL EXPERT TESTIMONY**

COMES NOW the Defendants Summit Point Automotive Research Center, LLC and the William Scott Inter Vivos Trust ("SPARC") by counsel and hereby responds to the Motion by Plaintiff Homeland Training Center, LLC ("HTC") to Permit it to Disclose and Designate Rebuttal Expert Testimony.

1. Pursuant to the parties agreement and this Court's orders (*see e.g.* doc. no. 255), SPARC named its expert and opinion witnesses on September 1, 2010, and transmitted formal written disclosures and reports on September 15, 2010. These dates gave SPARC a chance to respond to HTC's six own purported experts who were partially disclosed on July 1 and July 2, 2010. After

1

traveling to Oklahoma, Tennessee and Charleston, SPARC managed to depose HTC's experts by September 9.[1]

2. HTC's primary damages witness, Anna Kovalkova, has never produced a report. As noted in detail in SPARC Motion to Exclude Ms. Kovalkova's testimony [doc. no. 275], Ms. Kovalkova's disclosure consists of two unsigned, unexplained spreadsheets which were based on assumptions given to her by HTC's principal, Mr. Crants ("Crants"). SPARC was forced to take her deposition to try to understand precisely to what she intends to testify.

3. Although HTC suggests that Crants will testify about HTC's future income, Crants has no knowledge of future, hypothetical contracts. Any testimony about likely income requires an expert. *See* cases cited in SPARC's Motion to Exclude Crants's Opinion Testimony, doc. no. 286, pp. 8-11. As with Kovalkova, Crants has authored no expert report and his proposed testimony lacks any indicia of reliability. SPARC was forced to depose Crants to determine the basis (or lack thereof) for his damages claim.

4. Although HTC claims that it understood that SPARC would disclose only "three or four" experts, SPARC's counsel does not recall making such a representation. In any event, there were no formal limits placed on the amount of witnesses SPARC was permitted to disclose. After HTC disclosed its experts and opinion witnesses on July 1, SPARC immediately began preparing its

---

[1] Despite the fact that all subsequent deadlines were based on the timeliness of HTC's (the party with the burden) disclosures, a separate purported expert for HTC was not disclosed until September 10, 2010 – over 2 months past their agreed upon disclosure date. HTC also disclosed a new $722,000 damages claim on September 21, 2010 – well past the date on which discovery responses could be served and effectively preventing SPARC or its experts from analyzing the alleged damages. As SPARC has argued in its motion to strike HTC's damages claim, SPARC asked for the information allegedly underlying the $722,000 claim several years ago and received materially different answers. SPARC has moved to exclude both HTC's late disclosed experts and damages. Doc. no. 291.

2

responsive experts. Because HTC's disclosures were so brief, unsupported and unexplained, SPARC was forced to hire multiple experts, seek out the testimony of multiple opinion witnesses and serve many subpoenas simply to try to understand the claims against it. Given the size of HTC's claim ($13.83 million to $25.7 million), HTC reasonably should have expected SPARC to name the necessary experts and otherwise to take the matter seriously.

5. HTC's counsel has requested additional time in which to depose SPARC's witnesses. SPARC believes that the witnesses could have been deposed within the discovery cut off date established in the current scheduling order. The deposition timetable would have been difficult, but not impossible. However, HTC's counsel did work with SPARC's counsel to schedule depositions of HTC's witnesses earlier. As a matter of professional courtesy, SPARC's counsel agreed to ask the Court to extend the discovery cut off date and the trial date (a brief extension into December or early January) to allow HTC to take the depositions it wants to take.

6. Before and after asking the Court for the extension, the parties have begun scheduling the remaining depositions, and have, in fact, conducted two of those depositions. HTC's counsel has proposed a schedule for most of the remaining depositions, and it seems that the parties will be able to complete those depositions as currently scheduled. Nevertheless, HTC claims it is not able to reasonably investigate SPARC's witnesses and prepare for their testimony before trial.

7. Although SPARC is willing to grant HTC some more time in which to depose SPARC's experts, HTC's situation does not merit permission to file rebuttal testimony. HTC's instant Motion erroneously states that SPARC never disclosed 4 fact witnesses: Orsini, Raco, Ringstaff and Chewey. Doc. no. 293, p. 4. Two of those witnesses (Ringstaff and Raco) were disclosed in SPARC's previous pre-trial memorandum filed in August, 2008, doc. no. 98. Mr. Raco was also

present at the January, 2008 injunction hearing where SPARC intended to use him as a witness. Ms. Orsini was listed as a SPARC member in discovery answers filed in July, 2008, doc. no. 77. In fact, HTC itself listed Ringstaff and Orsini as possible witnesses in its *own* pre-trial disclosures in August, 2008 (doc. no. 99), and in that same document further listed as possible witnesses John Cupp and Lanny Bernier – two of the 12 opinion witnesses about which it now complains it has no time to investigate. HTC knew about these fact witnesses for years and could have deposed them at any time.[2]

8. Of SPARC's named witnesses, five produced expert reports. Those reports, which have been provided to opposing counsel and the Court, directly address HTC's witness disclosures, and the testimony provided by HTC's witnesses at their depositions. Carr and Martin address the technical failings of Anna Kovalkova's (HTC's only formal damages expert) testimony/spreadsheets, and McDonald addresses the speculative nature of the assumptions on which Ms. Kovalkova's testimony is based. Mr. Stephens's report counters HTC's intended hotel expenses testimony (testimony which HTC has never provided in a formal expert report, but merely attached to some discovery responses). Mr. Pekar addresses HTC's contention concerning the uniqueness of the Summit Point site by showing that there were several other sites in the area where HTC could have built its proposed facilities. These reports – from SPARC's only retained experts – present no surprise. They merely establish an expert defense that HTC should have expected.

---

[2] In its motion HTC also attached a chart (exhibit E) purporting to summarize potential deposition dates. That chart fails to include some dates which were provided by SPARC. For example, it fails to provide other dates provided for Dr. Carr's deposition. See **exhibit A**, Oct. 1, 2010 e-mail from SPARC to HTC.

9. HTC admits that "the majority" of SPARC's expert opinions seek to rebut opinions offered by its experts, it claims that "some opinions (i.e. recoverability of damages in government contracting and business valuation issues) range into areas not directly covered by HTC's expert disclosures." Doc. 293, p. 5. First, HTC made precisely one expert disclosure: Kovalkova; and although she did not bother to author a report, her testimony certainly concerned business valuation. Kovalkova Deposition, p. 13 ("Well, it's the value of the lost profits or really of the lost valuation of the venture that Mr. Crants was going to launch"). It is not clear what HTC means by "recoverability of damages in government contracting." To the extent that HTC raises a legal issue, case law conclusively demonstrates that future, hypothetical government contracting opportunities are not a legitimate basis for damages. *See e.g.* SPARC's Motion for Summary Judgment, doc. no. 291, pp. 10-15. In any event, Kovalkova was aware of the importance of government contracts, even if she did not have any meaningful knowledge of the subject. Kovalkova Deposition, pp. 53-55, 138. Crants's testimony also is supposed to concern "likely income" at the SPARC site, presumably from such contracts. Therefore, HTC can hardly claim that it is surprised if SPARC's motions or its expert's reports address the issue of government contracts when HTC's entire cash flow model and a substantial portion of its damages claim depends on such contracts.

10. The remaining opinion witnesses will likely testify that HTC's claims about future government contracts at the Summit Point site were unmerited based on their first hand knowledge of how difficult it is to obtain government contracts and room nights in this area or in similar established facilities. Once again, this testimony directly addresses HTC's affirmative claims concerning government contracts. It is testimony that HTC should have expected and does not merit rebuttal testimony.

5

11. HTC has had ample time to prepare its expert case and to investigate relevant witnesses. HTC has worked with Kovalkova since at least 2007 and presumably has known since then the substance of her testimony. Ms. Kovalkova's estimates have formed the basis of HTC's alleged damages for several years now – both parties have relied on them in preparing their claims and defenses. HTC should have known years ago that Ms. Kovalkova's spreadsheets are not sufficient to support its multimillion dollar damages estimate. She admitted that her testimony is based solely on the speculation of Doctor Crants – she inputted his figures directly, she did no due diligence of her own and she was not even paid for her work. See SPARC's Motion to Exclude Testimony of Anna Kovalkova, doc. no. 275, pp. 5-6.

12. HTC now seems surprised that SPARC counters Ms. Kovalkova's proposed testimony with legitimate expert reports. Unlike Ms. Kovalkova, SPARC's experts produced lengthy reports which comprehensively explain their positions and demonstrate in detail the numerous errors in Ms. Kovalkova's analysis.[3] See Martin, Carr and McDonald Reports. Thinking that it had nothing to lose, HTC may have hoped to try this case inexpensively with unpaid, unqualified "experts" and witnesses whose association with HTC and Crants make them less than disinterested. HTC made the choice to proceed using Ms. Kovalkova as the basis for its case. That was a risk it was permitted to take. However, now that the critical and blatantly obvious flaws in Kovalkova and Crants's

---

[3] HTC apparently still does not understand the damages testimony offered by Kovalkova. It summarizes her testimony "as discounted cash flow analysis" (doc. no. 293, p. 2) when in fact discounted cash flow was only a portion of what Kovalkova tried to do. See Martin Report. The fact that Kovalkova attempted several different valuations is one of the reason that SPARC retained multiple experts to oppose her testimony.

purported testimony have been exposed, HTC should not be permitted to delay this matter while it finally attempts to do the proper expert work that it should have done long ago.

13. Because Kovalkova is HTC's only relevant damages "expert" there is no other expert from whom HTC plausibly may need to elicit rebuttal testimony.[4] Moreover, neither Kovalkova nor any other relevant witness[5] produced a report in the first place. This fact alone demonstrates that those witnesses are not really experts, *see e.g.* Salgado by Salgado v. General Motors Corp., 150 F.3d 735, 742 n. 6 (7th Cir. 1998), and it also undermines HTC's claim that it should be allowed to produce a rebuttal report. HTC cannot fairly demand the opportunity to submit a rebuttal report when it failed to provide SPARC or the Court an initial report from its alleged damages experts. Gallagher v. Southern Source Packaging, LLC, 568 F.Supp.2d 624, 631 (E.D.N.C.,2008) ("Courts distinguish 'true supplementation' (e.g., correcting inadvertent errors or omissions) from gamesmanship, and have therefore repeatedly rejected attempts to avert summary judgment by

---

[4] HTC's named witness Mr. Holmes and SPARC's expert Mr. Stephens will offer different hotel operation cost figures. Mr. Holmes claims that HTC's proposed dormitory would have been profitable; Mr. Stephens testified that HTC's cost figures were unrealistic and that, had HTC built its intended facilities, it would have lost money. The mere fact that these experts disagree is not "good cause" to allow for a rebuttal report. HTC will have the opportunity to consult with Mr. Holmes before it deposes Mr. Stephens. Moreover, Mr. Holmes – like the rest of HTC's witnesses – never produced an expert report in the first place and should not be allowed to try to do now what it should have been done long ago. See cases sited *infra*.

[5] HTC produced a report by Jay Goldman concerning its alleged Category 3 "leasehold value" claim. One of SPARC's experts did produce a report to counter Mr. Goldman's report. However, at deposition Mr. Goldman testified that he was not providing damages value (or any value at all) for the property. **Exhibit B**, Goldman Deposition, p. 11, 63-64. With respect to the supposed uniqueness of the Summit Point site, he said HTC's desire to locate its facilities at Summit Point was "a business decision." *Id.* at 66-67. Therefore, Goldman's report simply is not relevant to the only remaining issues (HTC's alleged damages) and there is no good cause for a rebuttal report. Moreover, HTC withdrew its Category 3 "leasehold value" damages claim, making Goldman's work irrelevant and eliminating the need for any rebuttal report on the issue. Crants deposition, pp. 235-36.

'supplementing' an expert report with a 'new and improved' expert report"); Steele v. Kenner, 129 Fed.Appx. 777, 780, 2005 WL 906190, 2 (4th Cir. 2005) ("A party may not use rebuttal as an attempt to introduce evidence that he should have introduced in his case-in-chief").

14. This Court stated in its February, 2010 scheduling order that it would only permit rebuttal expert testimony for "good cause shown." Doc. no. 130, p. 2. The "touchstone" of the good cause standard is diligence. Hager v. Graham, 2010 WL 1537158, *2 (N.D.W.Va. 2010) (Stamp, J.). "Lack of diligence and carelessness are the hallmarks of failure to meet the good cause standard." Hare v. Opryland Hospitality, LLC, 2010 WL 3719915, 3 (D.Md.2010) (citing W. Va. Hous. Dev. Fund v. Ocwen Tech. Xchange, Inc., 200 F.R.D. 564, 567 (S.D.W.Va.2001)); Akeva L.L.C. v. Mizuno Corp., 212 F.R.D. 306, 310-311 (M.D.N.C.2002) ("After the smoke of plaintiff's argument clears, the facts simply show that plaintiff was surprised by [the opposing expert's] testimony. . . . In essence, because [the opposing expert] conducted a test that might cast doubt on [plaintiff's expert's results], plaintiff decided to bolster its case by getting a new expert and having [its previous expert] conduct another type of test. These expert reports certainly have some aspects of rebuttal testimony about them, but may also be characterized as makeup for initially inadequate or incomplete preparation. In all events, the Court cannot find that plaintiff has advanced just cause for failing to obtain this testimony earlier . . .").

15. Although HTC now asks for permission to offer rebuttal testimony, for the several years prior to this point, it allowed Ms. Kovalkova to produce two unsigned, unexplained spreadsheets asking for millions of dollars and assumed that was enough to qualify as an expert disclosure. Even now it characterizes some of its witnesses as "fact/expert" witnesses despite the fact that they have

never produced reports pursuant to Rule 26(a)(2). *See* doc. no. 293, p.3. HTC's purported experts' carelessness and lack of diligence, including their failure to provide reports or to testify competently about the subject matters on which they are supposed to opine, does not constitute good cause. Moreover, because SPARC's experts address issues already raised by HTC's witnesses, there is no good cause for HTC's to ask for either rebuttal testimony from its current experts or for permission to name new experts.

There is no surprise or unfairness here. The fact that SPARC and its experts have demonstrated that Plaintiff's claims are without merit and that Plaintiff's entire damages claim is speculative and hopelessly flawed is no reason to extend this trial or allow additional expert testimony. If anything, Plaintiff's motion to allow additional expert testimony is a tacit admission that Plaintiff's entire claim lacks merit and that judgment should be entered now in favor of the Defendants pursuant to pending motions.[6] Therefore, and for the reasons stated above, SPARC asks

---

[6] Plaintiff's counsel has known from the beginning that the Plaintiff likely could not prove damages. Nevertheless, Plaintiff wished the opportunity to try. The Court gave Plaintiff that opportunity. It failed to meet its burden. There is no reason to extend the cost of this litigation or the pendency of this litigation further. On December 18, 2007, counsel for the Plaintiff stated: "The question obviously arises is (sic) whether or not money damages would be an appropriate remedy in this case. And, Your Honor, we would suggest that it would not be. (emphasis added). Primarily given the fact that the money damages, although not impossible to prove, would be harder for us to prove in this case. And the Fourth Circuit case law that we cited indicate (sic) that where you have cases - - says where money damages would be hard to prove, or difficult to prove, then that's appropriate case for injunctive relief, particularly in West Virginia where we have not completely - - the new business rule doesn't apply altogether. And since in the sense that you can try to recover damages in terms of a (sic) lost profits from a business that never existed before, it is a very high burden under West Virginia law to do that. So I would suggest that this is a case where damages would be very hard to prove if we have to come in and prove money damages, only putting aside the uniqueness of the property issue". December 18, 2007 Hearing Transcript, p.14, 1.22 - p.15, 1.14, at Joint Appendix 300-301.

this Honorable Court to deny HTC's Motion to Permit it to Disclose and Designate Rebuttal Expert Testimony.

                                                                              **SPARC, by counsel:**

**s/ Wm. Richard McCune, Jr.**
Wm. Richard McCune, Jr. (WV Bar #2429)         Peter L. Chakmakian (WV Bar #687)
Alex A. Tsiatsos (WV Bar #10543)                      *Peter L. Chakmakian, L.C.*
*Wm. Richard McCune, Jr. PLLC*                       108 North George Street
115 West King Street                                              P.O. Box 547
Martinsburg, WV 25401                                        Charles Town, WV 25414
304-262-2500                                                           304-725-9797

## IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
## MARTINSBURG DIVISION

HOMELAND TRAINING CENTER, LLC,

    Plaintiff,

v.

Civil Action No. 3:07-cv-160
Judge Bailey

SUMMIT POINT AUTOMOTIVE RESEARCH CENTER, LLC and the WILLIAM SCOTT INTER VIVOS TRUST

    Defendants/Third-Party Plaintiffs,

v.

HOMELAND SECURITY CORPORATION,

    Third-Party Defendant.

## **CERTIFICATE OF SERVICE**

    I, the undersigned attorney, co-counsel for Defendants/Third-Party Plaintiffs Summit Point Automotive Research Center, individually and the William Scot Inter Vivos Trust in the foregoing action, hereby certify that on this 8th day of October, 2010, I electronically filed the foregoing **Defendants' Response in Opposition to Plaintiff's Motion to Permit it to Disclose and Designate Rebuttal Expert Testimony** with the Clerk for the Court using the CM/ECF system, which will send notification of such filing to the following:

J.H. Mahaney, Esq.
Huddleston Bolen, LLP
P.O. Box 2185
611 Third Ave.
Huntington, WV 25701

                                   **s/ Wm. Richard McCune, Jr.**
                                   Wm. Richard McCune, Jr.
                                   Alex A. Tsiatsos
                                   Peter L. Chakmakian