**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**MARTINSBURG DIVISION**

**HOMELAND TRAINING CENTER, LLC,**

                      *Plaintiff*,                 Civil Action No. 3:07-cv-160

v.                                         Judge Bailey

**SUMMIT POINT AUTOMOTIVE**
**RESEARCH CENTER, LLC,** *et al.*

                    *Defendants/Third-Party Plaintiffs*,

**HOMELAND SECURITY CORPORATION**,

                    *Third-Party Defendant*.

**REPLY TO RESPONSE TO MOTION TO EXCLUDE**
**TESTIMONY OF ANNA KOVALKOVA**

     Defendants/Third-Party Plaintiffs Summit Point Automotive Research Center, LLC and the William Scott Inter Vivos Trust ("SPARC") hereby reply to Plaintiff Homeland Training Center, LLC ("HTC") Response in Opposition [doc. no. 315] to SPARC's Motion to Exclude Testimony of Anna Kovalkova ("Kovalkova").

     In response to SPARC's <u>Daubert</u> challenge to Kovalkova's testimony, HTC makes three claims: 1) Kovalkova's background and training are sufficient; 2) Kovalkova did not need to produce a written report; and, 3) Kovalkova's opinions meet the <u>Daubert</u> standard.  Not only are these three claims wrong, but HTC's response does not meaningfully discuss several other fundamental challenges raised in SPARC's Motion: Kovalkova's reliance upon admittedly speculative and inflated data, her failure to use comparable companies for analysis purposes, and her failure to address the issue of causation.

I.      **Kovalkova's experience does not qualify her as someone who can prove damages to a reasonable certainty under West Virginia law**.

Ms. Kovalkova's professional mandate is to evaluate "mid-stage, mid-market" businesses for possible investment.  **Exhibit A**, Kovalkova Deposition, pp. 146-47.[1]  Her firm has not invested in a start up company (which is what she calls HTC, *id*. at 147), in "many years."  She relies on "pitch books," which showcase the "investment opportunity that entrepreneurs try to pitch to its [sic] investors" to form a valuation of a subject company for investment purposes.  *Id*. at 204-207.

This process may be useful to investors looking for an investment opportunity, but it is not the process by which one proves damages to reasonable certainty.  In fact, the real estate company created for purposes of promoting the HTC project at Summit Point , Homeland Security Facilities, LLC, cautioned investors about "the speculative nature and risks of loss associated with investments in start-up development stage companies and that the Purchaser may suffer a substantial loss of or all of the Purchaser's investments. . . . this is a speculative investment which involves a high degree of risk of loss . . ."  HSF Subscription Agreement, p. 2 (previously produced as exhibit J to doc. no. 275).  West Virginia law expressly forbids the recovery of alleged lost profits which are speculative, but instead demands that they be proven with  reasonable certainty.  Syl. pts. 1 & 2, Cell v. Ranson, 427 S.E.2d 447 (W. Va. 1992).  Nowhere does Kovalkova even claim that her work establishes lost profits to a reasonable certainty.  When asked about HTC's claim that it was "reasonably certain" to attract some sources of income, she admitted that she did not know any facts upon which that claim was based.  Kovalkova deposition, at 59.

---

[1]  In an effort to reduce the amount of paper for Court's review, SPARC will attach to this Reply Brief only those exhibits and pages that it did not previously produce with its previous filings.

Ms. Kovalkova's qualifications, or lack thereof, are important indicators of the reliability of her opinions.   Clark v. Eagle Nest, Inc., 1998 WL 830658, *2 (4th Cir. 1998) (citations omitted). Her background in pitchbooks and investments gives no reason to suggest that she has the technical ability to prove lost profits or other damages to a "reasonable certainty."  *See* Meterlogic, Inc. v. KLT, Inc., 368 F.3d 1017, 1019 (8th Cir. 2004) (affirming exclusion of expert where expert did not review market data, did not review data underlying business growth rate, did not have data concerning future sales and where expert based analysis on an "investment-planning tool").

Kovalkova testified that she does not know what the governing professional standards for business valuation are or whether her valuations complied with those standards.   Kovalkova Deposition, pp. 158-61.   Setting aside for the moment her lack of professional certifications, accounting or post graduate degrees or publications, if she does even not know what standards her work is supposed to meet, how can she or HTC assure the Court that her work is reliable under Fed. R. Evid. 702?  She cannot; therefore, Rule 702, Daubert and its progeny preclude her testimony.[2]

## II.    Kovalkova was required to produce a report in compliance with Fed. R. Civ. P. 26(a)(2).

Based on Kovalkova's proposed testimony, HTC seeks somewhere between $13.83 or $25.7 million dollars in this case.  *See* HTC's Second Supplemental Expert Disclosures, attached to doc. 275 as exhibit E.   One would assume that a defendant facing that sort of damages claim from a purported expert would be entitled to know something about that claim: perhaps most importantly, the basis and reasons for the claim. Fed. R. Civ. P. 26(a)(2)(B)(I)-(vi) codifies what an expert report

---

[2] Kovalkova's lack of credentials comprises only a relatively small part of SPARC's Daubert challenge.  As will be discussed *infra*, even if she had sufficient credentials, her proposed testimony fails the core requirements of Daubert and Fed. R. Evid. 702: reliability and relevance.

3

should contain: a complete statement of the expert's opinions, including the basis and reasons for the opinions, the data the expert used in forming his or her opinions, supporting exhibits, qualifications, publications, previous cases and a statement of compensation.

Nevertheless, HTC now claims that it was not required to produce a report from Ms. Kovalkova because she is a "percipient expert" – i.e. was not retained or specially employed to provide expert testimony and because she is not an HTC employee who regularly gives expert testimony.[3]   Essentially, HTC argues now that it can demand $25.7 million dollars without giving SPARC a formal explanation and without providing a justification to this Court.

It is true that some experts are not required to produce reports.  The classic example of this type of expert is a treating physician who examines a patient prior to litigation.  *See e.g.* Advisory Committee Notes to Fed. R. Civ. P. 26, 1993 Amendments.  HTC argues that Kovalkova is such a witness because she prepared her valuations "before even a hint of litigation" and cites 350 W.A. LLC v. Chubb Group of Ins., 2007 WL 4365502, *15 (S.D.Cal. 2007) as authority.  HTC, however, neglects to note the following critical language in Chubb Group:

> "Often referred to as 'percipient expert witnesses,' unretained experts are limited in an important respect – they cannot give opinion testimony based on information obtained outside of their personal knowledge.  Indeed, while an unretained percipient expert witness may testify about observations based on personal knowledge, ***opinion testimony based on information acquired outside of the witness' knowledge triggers the requirements of Rule 26(a)(2)(B); namely, the written expert report***"

Chubb Group, 2007 WL 4365502 at *15 (citations and internal punctuation omitted).  *See also* Matsuura v. E.I. du Pont De Nemours and Co., 2007 WL 433115, *3 (D.Hawai'I 2007) ("To be

---

[3]  HTC makes this argument for the first time in its response brief. In its formal disclosure of Kovalkova, it never suggested that Ms. Kovalkova was exempt from Fed. R. Civ. P. 26(a)(2)(B)'s requirements, despite claiming exemption for its other witnesses.  *See* doc. no. 275, exhibit D.

clear, these percipient expert witnesses cannot, however, give opinion testimony based on information obtained outside of their personal knowledge, for instance, from reading the deposition testimony of other witnesses"); Salas v. U.S., 165 F.R.D. 31, 33 (W.D.N.Y.1995).

Kovalkova repeatedly admitted that her testimony was not based on personal observation. She explicitly stated that the basis of her testimony came from HTC's principal Doctor Crants. Kovalkova Deposition, pp. 66-67 (A. "I don't know why [the numbers were different]. They were revised by Doc Crants." Q. "All right.  So this wasn't your work; it was his work?"  A. "That's correct."  Q. "He provided you the figures; you put them into your spreadsheet?" A. "That's correct.").  HTC confirmed this when in its motion it stated "Admittedly, the revenue or 'cash flow' information utilized by Mrs. Kovalkova came from Doctor Crants."  Doc. no. 315, p. 6.  Kovalkova therefore has no personal knowledge of and did not personally observe any of the data on which she bases her testimony.  Therefore, she was required to produce a report – which HTC concedes she failed to do.  Doc. no. 315, pp. 4-5.

Moreover, contrary to HTC's assertions, Kovalkova's only formal disclosure in this case – her two spreadsheets valuing HTC at either $13.83 or $25.7 million – were indeed prepared after litigation began and were repeatedly updated (at Crants's and HTC's counsel's request) to augment HTC's alleged damages.  Kovalkova Deposition, pp. 94-98, 105-108 (noting that Crant asked her to update HTC's cash flow to 100% of real estate company's cash flow in June, 2010).  Even if HTC claims that Kovalkova's initial valuations were conducted for other purposes, her only formal disclosures – the alleged basis for HTC's damages in this case – were created and updated well after litigation began.   Therefore, for this reason too, Kovalkova was required to produce a report. Because she did not produce a report, her testimony must be excluded.  Fed. R. Civ. P. 37©.

**III.    Kovalkova's testimony fails <u>Daubert</u>'s reliability requirement because her valuations are admittedly inflated, speculative and fail to comply with basic valuation rules concerning comparable companies.**

Although Kovalkova obtained all of her information from Crants (who told her what information to use and how to use it), Kovalkova Deposition, pp. 66-67; doc. no. 315, p. 6, HTC discounts Crants's role by arguing that experts are allowed to rely on one another, and draws an analogy to a doctor who examines the file which contains tests performed by other doctors.

There are several problems with this analogy.  First, Kovalkova's reliance on Crants's numbers is so complete that she essentially becomes nothing more than a calculator whose testimony is not helpful.  <u>U.S. v. Johnson</u>, 54 F.3d 1150, 1162 (4th Cir. 1995) ("simple arithmetical calculations were not an appropriate subject for expert testimony under Rule 702") (citation omitted). Kovalkova did not perform any due diligence.  She simply took Crants's numbers at face value, and when Crants changed his numbers without providing any reason or documentary support, she changed her testimony.  The overwhelming weight of case law conclusively demonstrates that, at this level of dependence, an expert's testimony is not admissible.  <u>Lyman v. St. Jude Medical S.C., Inc.</u>, 580 F.Supp.2d 719 (E.D.Wis. 2008) (expert data unreliable where expert did not verify data but merely accepted word of counsel concerning future sales); <u>In re TMI Litig.</u>, 193 F.3d 613, 697-98 (3rd Cir.1999) (upholding exclusion of expert testimony where sole basis for the testimony was summaries prepared by party's attorney); <u>Montgomery County v. Microvote Corp.</u>, 320 F.3d 440, 448-49 (3rd Cir.2003) (underlying data was unreliable where expert did not base his opinion on primary data, did not know what the document was, who created it, or how it was created); <u>Crowley v. Chait</u>, 322 F.Supp.2d 530, 546-47 (D.N.J.2004) (where expert relied on summaries prepared by counsel and conducted little independent investigation, "to allow him to offer testimony to a jury as

to conclusions he has reached on the basis of this highly filtered version of events, is unacceptable")); Jones v. Lincoln Elec. Co., 188 F.3d 709, 724 (7th Cir.1999) (finding an expert unqualified when he relied on another's expertise); Nationwide Transport Finance v. Cass Information Systems, Inc., 2006 WL 5242377, 3  (D.Nev.2006) (expert did not reliably apply his own experience to the facts of this case but instead relied on another witnesses experience); Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 157 (1999) "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." (citation omitted).

Next, Crants is not a source on which expert testimony reliably may be based.  Crants added $900,000 in alleged damages to Kovalkova's work reflecting money that he intended to borrow in the future to pay his potential investors, Crants Deposition pp. 252-53; and he increased HTC's damages claim by several million dollars just because he wanted to see how it looked.  *Id*. at 269-70. Despite predicting millions in future cash flow from future government contracts, Crants had no contracts in place, had not bid on a single contract and did not have even any letters of intent.  Crants Deposition, pp. 196-97, 207-08 and 322.  Crants had no guarantee, to a reasonable certainty or otherwise, that he would have obtained the millions in government contracts he hoped for.  *See e.g.* Olin Jones Sand Co. v. United States, 225 Ct.Cl. 741, 1980 WL 13211 (1980) ("Receipt or non-receipt of future contracts is both speculative in nature and dependent on many factors not related to [the injury to the plaintiff]") and cases cited in SPARC's Motion for Summary Judgment.

Kovalkova knew that contracts were important to HTC's claim, but did not question Crants and she did not exercise any professional judgment.  Instead, she did precisely what Crants wanted and inflated her damages figures accordingly.  Such speculation lack of critical underlying

7

information obviously cannot constitute "sufficient facts or data" required as foundations for expert opinions under Rule 702.  Therefore, to the extent that Kovakova's work relies on Crants's input, it is infected by the same unreliability that plagues Crants's proposed testimony and is inadmissible.[4] Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 590 (1993) (A purported expert's knowledge must be "more than subjective belief or unsupported speculation"); Tyger Const. Co. Inc. v. Pensacola Const. Co., 29 F.3d 137, 142 (4th Cir.1994) *cert. denied* 513 U.S. 1080 (1995) ("expert's opinion should be excluded when it is based on assumptions which are speculative and are not supported by the record") (citations omitted); Mitchell v. Gencorp Inc., 165 F.3d 778, 782 (10th Cir. 1999) ("Under Daubert, any step that renders the analysis unreliable renders the expert's testimony inadmissible") (citation and internal punctuation omitted).[5]

Kovalkova's failure to follow the most basic rules of business valuation further undermine the purported reliability of her work.  Her comparable company analysis is only reliable to the extent that the companies chosen are truly comparable.  Celebrity Cruises Inc. v. Essef Corp., 434 F.Supp.2d 169, 179 (S.D.N.Y.,2006) ("the comparable companies method is reliable only to the extent that the companies chosen are truly comparable"); Caracci v. C.I.R., 456 F.3d 444, 459 (5th

---

[4] HTC's analogy to a doctor reviewing another doctor's test fails, therefore, because Crants did not perform any "tests."  He had no past performance, contracts or other objective date concerning HTC. He has only his speculation about future cash flow unsupported by any record.

[5] On page 9 of its Motion, HTC recites the five Daubert guidelines for scientific testimony which it believes are applicable to Kovalkova's work: whether a theory can be tested; whether a theory has been subject to peer review and publication; the known rates of error; the existence and maintenance of standards controlling the technique's operation; and, the theory's general acceptance in the scientific community.  It is not clear why HTC seeks to hold Kovalkova's work to the rigorous degree of scientific scrutiny in Daubert when Kumho established a much more flexible approach "to determine reliability in light of the particular facts and circumstances of the particular case." 526 U.S. at 158.  However, SPARC's challenge to Kovalkova does not depend on the valuation principles she purported to use, but to her application of those principles to the facts of the case.  Rule 702 requires the witness to apply "the principles and methods reliably to the facts of the case."

Cir. 2006) ("[a] 'comparable' must be substantially similar to the entity or asset that is at issue") (citations omitted).

Kovalkova also admitted that she doesn't know why those companies on her spreadsheets were chosen, who chose them or what business they were in. *Id*. at 28, 77-78. For this reason, too, Kovalkova's analysis is unreliable and inadmissible. *See e.g.* Celebrity Cruises Inc. v. Essef Corp. 434 F.Supp.2d 169, 181 -182 (S.D.N.Y.,2006) (failure to use comparable companies/transactions made analysis unreliable and mandated exclusion); Lippe v. Bairnco Corp., 288 B.R. 678, 697-98 (S.D.N.Y.2003)(rejecting testimony of expert who chose comparable companies "without explaining why and without any independent analysis of whether the supposed comparables actually were comparable") affirmed 99 Fed.Appx. 274 (2nd Cir. 2004) (expert's "indicia of unreliability" included "inability to explain a number of variables and assumptions used . . . and which companies were comparable to those being valued").[6]

## IV.   Neither Kovalkova in her testimony nor HTC in its response address the critical issue of causation.

Despite being listed a potential witness on causation (i.e. HTC's alleged inability to obtain financing), Kovalkova's spreadsheets contain no discussion of causation whatsoever. She testified that she was not familiar with any financial commitments made by anybody to the project, and she has no knowledge of any written commitment for financing. Kovalkova Deposition, pp. 219-20. Based on testimony from Crants and HTC's other witnesses, financing failed on multiple occasions

---

[6] Moreover, Kovalkova's analysis is unreliable because HTC was many, many times smaller than the comparable companies she used. Cell, Inc. v. Ranson Investors, 427 S.E.2d 447, 450 (W.Va.1992) (rejecting as speculative comparison of alleged profitability of 9200 sq. ft. store with 17200 sq. ft. store). Incredibly, however, Kovalkova testified that potentially massive differences in size do not matter for comparison purposes. *Id*. at 28-29. For a full discussion of the technical failings of Kovalkova's work, please see the reports by SPARC's experts Harold Martin and Scott Carr previously filed with the Court.

for reasons unrelated the SPARC/HTC lease dispute. Crants's Deposition, pp. pp. 91-94, 118-123; SPARC Motion for Summary Judgment, doc. no. 291, pp. 18-21. There is no documentary evidence demonstrating that SPARC caused HTC financing difficulties. There is also no other indication on the record that Kovalkova considered the cause of HTC's inability to obtain financing. In fact, in its response brief HTC does not address the issue of causation at all.

Kovalkova's and HTC's failure to discuss causation is fatal to her testimony. Under West Virginia law, "[l]ost profits are special damages which can be awarded only when they are the proximate result of the defendant's wrongdoing." Keister v. Talbott, 391 S.E.2d 895, 901 (W.Va.1990). With respect to a damages expert, a court "can only admit an expert's opinion when competent evidence proves to a degree of reasonable certainty that Plaintiff will suffer the claimed damages." Water Engineering Consultants, Inc. v. Allied Corp., 674 F.Supp. 1221, 1224 (S.D.W.Va.1987) (citing Baker v. Kroger, 784 F.2d 1172 (4th Cir.1986)). "An expert's opinion as to damages must be causally related to the alleged harm." Tyger Const. Co. Inc. v. Pensacola Const. Co., 29 F.3d 137, 142 (4th Cir.1994). A purported damages expert's failure to consider the cause of damages undermines the expert's testimony. See e.g. Children's Broadcasting Corp. v. Walt Disney Co., 245 F.3d 1008, 1018 (8th Cir. 2001) (cash flow expert testimony disallowed where "his theory of causation was questionable"); Salazar v. U.S., 2003 WL 25695854, *3-4 (S.D.W.Va. 2003) (failure of expert to consider alternate explanations is a factor to consider under Daubert) (citations omitted); Robert L. Dunn, RECOVERY OF DAMAGES FOR LOST PROFITS, Vol. II, p. 646, 685 (6th ed. 2005) ("More is required of a plaintiff than the assertion (either directly or through an expert witness) that plaintiff would have made a particular amount in profits" . . . plaintiff must show "profitable opportunities that were lost"); Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.,

75 F.Supp.2d 235, 238 (S.D.N.Y.1999) ("expertise is not helpful to the extent that it is based upon a causation assumption that plaintiff cannot prove").

Neither HTC nor Kovalkova have made any attempt to relate Kovalkova's damages testimony to SPARC's actions. Kovalkova simply assumed that SPARC should pay HTC between $13.83 and $25.7 million dollars because Mr. Crants said so. Such testimony is neither reliable nor relevant under Daubert, and must therefore be excluded.

## V.    Conclusion

This Court's role as a gatekeeper requires it to guard against unreliable and irrelevant expert testimony. Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589 (1993). Kovalkova's proposed testimony is unreliable because she did not attempt to verify her work, but merely accepted the constantly changing and self-serving speculation of HTC's majority owner. She ignored basic, court-recognized rules concerning business valuation. She has no relevant experience preparing damages estimates to a reasonable certainty, and despite preparing and augmenting her valuations during this litigation, she did not produce a report or in any way meaningfully explain why SPARC should pay HTC the millions of dollars that HTC seeks. This lack of causal connection also makes her testimony irrelevant.

HTC simply cannot meet its burden of proving the admissibility of Kovalkova's testimony. Cooper v. Smith & Nephew, Inc., 259 F.3d 194, 199 (4th Cir. 2001). Therefore, and for the reasons stated above and in SPARC's opening brief [doc. no. 275], SPARC asks this Honorable Court to exclude the testimony of Anna Kovalkova.

**SPARC**, by counsel

11

**s/Wm. Richard McCune, Jr.**

| | |
|---|---|
| Wm. Richard McCune, Jr. (WV Bar #2429) | Peter L. Chakmakian (WV Bar #687) |
| Alex A. Tsiatsos (WV Bar #10543) | *Peter L. Chakmakian, L.C.* |
| *Wm. Richard McCune, Jr. PLLC* | 108 North George Street |
| 115 West King Street | P.O. Box 547 |
| Martinsburg, WV 25401 | Charles Town, WV 25414 |
| 304-262-2500 | 304-725-9797 |

12

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
## MARTINSBURG DIVISION

**HOMELAND TRAINING CENTER, LLC,**

                         *Plaintiff*,           Civil Action No. 3:07-cv-160

v.                                        Judge Bailey

**SUMMIT POINT AUTOMOTIVE**
**RESEARCH CENTER, LLC,** *et al.*

                     *Defendants/Third-Party Plaintiffs*,

**HOMELAND SSECURITY CORPORATION,**

                     *Third-Party Defendant*.

### CERTIFICATE OF SERVICE

I, the undersigned attorney, counsel for Defendants Summit Point Automotive Research Center, individually and in its capacity as trustee of the William Scot Inter Vivos Trust in the foregoing action, hereby certify that on this 18th day of October 2010, I served a true and accurate copy of the foregoing **Reply to Response Motion to Exclude Testimony of Anna Kovalkova** by filing the same with the Clerk using the CM/ECF system which will send notice to:

J.H. Mahaney, Esq.
Huddleston Bolen, LLP
P.O. Box 2185
611 Third Ave.
Huntington, WV 25701

**s/ Wm. Richard McCune, Jr.**
Wm. Richard McCune, Jr. (WV Bar #2429)
Alex A. Tsiatsos (WV Bar #10543)
Peter L. Chakmakian (WV Bar #687)

13